Peter M. Haas phaas@cftc.gov
Richard P. Foelber rfoelber@cftc.gov
*Pro Hac Vice*
U.S. Commodity Futures Trading Commission
1155 21st Street N.W.
Washington, D.C. 20581
(202) 418-5000 (telephone); (202) 418-5523 (facsimile)

THOMAS P. O'BRIEN
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
MARCUS M. KERNER
Assistant United States Attorney
California Bar Number: 107014
United States Courthouse, Room 8000
411 West 4th Street
Santa Ana, CA 92701
Telephone: (714) 338-3532
Facsimile: (714) 338-3523
E-mail: marcus.kerner@usdoj.gov
Attorneys for Plaintiff U.S. Commodity
  Futures Trading Commission

JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**SAFEVEST, LLC, JON G. ERVIN, and JOHN V. SLYE,**<br><br>**Defendants.** | **Case No. SACV08-00474 JVS (MLGx)**<br><br>**ORDER OF FINAL JUDGMENT BY DEFAULT FOR PERMANENT INJUNCTION, RESTITUTION, DISGORGEMENT, CIVIL MONETARY PENALTY, AND ANCILLARY EQUITABLE RELIEF AGAINST DEFENDANT SAFEVEST, LLC** |

# I.

## INTRODUCTION

This matter is before the Court on the motion of plaintiff U. S. Commodity Futures Trading Commission ("CFTC") for entry of a final judgment by default for permanent injunction, restitution, disgorgement, civil monetary penalty, and ancillary equitable relief against defendant Safevest, LLC ("Safevest").  Based on the failure of Safevest to answer or otherwise appear in this proceeding, the CFTC is entitled to a final judgment by default for permanent injunction, restitution, disgorgement, civil monetary penalty, and ancillary equitable relief against Safevest.

This Court has considered the entire record in this matter, including the Complaint, the CFTC's *Motion For Statutory Ex Parte Restraining Order, Expedited Discovery, Preliminary Injunction, and Other Equitable Relief* containing sworn testimonial evidence supporting the allegations in the Complaint and the relief requested, and the *Motion for Entry of Final Judgment By Default For Permanent Injunction, Restitution, Disgorgement, Civil Monetary Penalty, and Ancillary Equitable Relief Against Defendant Safevest LLC* containing calculations for restitution, disgorgement, and a civil monetary penalty.  Accordingly, the Court makes the following findings of fact and conclusions of law, directs the entry of a permanent injunction, and imposes an order for restitution, disgorgement, civil monetary penalty, and ancillary equitable relief.

# II.

## FINDINGS OF FACT

**A.    Safevest is in Default**

1.    The CFTC's Complaint was filed on May 1, 2008.  Defendant Safevest was properly served with the Complaint and this Court's Summons and the service affidavits for Safevest were filed with the Court.

2.      Safevest is a limited liability corporation registered with the Nevada Secretary of State on May 15, 2007.  Defendants Jon G. Ervin ("Ervin") and John V. Slye ("Slye") are listed as the sole corporate officers on Safevest's corporate documents.  Safevest maintains an office in Mission Viejo, California.  Safevest has never been registered with the CFTC in any capacity.

3.      Safevest has not filed an answer to the Complaint and it has not otherwise appeared before this Court to defend this cause.

4.      Safevest is neither an infant nor incompetent person, and is not eligible for relief under the *Soldiers' and Sailors' Civil Relief Act of 1940* (50 App. U.S.C. § 501 *et seq.*).

5.      Safevest is a corporate entity.  No appearance has been entered by counsel on behalf of Safevest.  As a corporation, Safevest may not appear or otherwise plead *pro se* in this litigation.

6.      Based on its failure to appear or otherwise plead in this proceeding, the allegations in the Complaint as to Safevest are deemed admitted.  Accordingly, the following allegations set forth in the Complaint against Safevest are admitted.

**B.      Safevest Committed Fraud**

**Operation of the Safevest Pool**

7.      In May 2007, Safevest was formed as a Nevada limited liability corporation and opened an office in Mission Viejo, California.  Safevest operated through agents or other persons acting within the scope of their employment or office with Safevest.

8.      Between May 2007 and May 2008 ("relevant time"), Safevest fraudulently solicited over 500 persons to send Safevest over $25.7 million to purchase interests in a commodity pool (the "Safevest Pool") for the purpose of trading commodity futures contracts on or subject to the rules of a contract market. Safevest falsely represented to prospective pool participants that the Safevest Pool

was a commodities fund and that funds in the pool were used to trade commodity futures contracts on commodity exchanges located in Chicago, Illinois. Safevest did not use these funds to trade commodity futures contracts and, in fact, misappropriated these funds.

9.  To induce persons to send funds, Safevest misrepresented to prospective pool participants that Safevest used computerized trading software that consistently produced daily profits between 1.6% and 1.9% since June 2007.

10.  Safevest provided, or caused to be provided, to prospective pool participants "Safevest Client Participation Forms." These documents include the following:

> Form A:  Non-Solicitation Letter;
>
> Form B:  Non-Disclosure/Non-Circumvention Agreement;
>
> Form C:  Private Placement Joint Venture Finder's Fee Agreement;
>
> Form D:  Joint Venture Private Placement Agreement;
>
> Form E:  Overall Summary;
>
> Form F:  Reserve Authorization and Election of Participation Contract Addendum ("Participation Agreement");
>
> Form G:  Client Transmittal;
>
> Form H:  Transmittal Deposit/Withdrawal Information

11.  The Safevest Client Participation Forms that Safevest distributed or caused to be distributed to prospective pool participants contained numerous material misrepresentations and omissions regarding the existence and profitability of the Safevest Pool.

12.  Safevest also provided or caused to be provided to prospective pool participants two documents entitled "Executive Summary" and "May Trading Track Record." The Executive Summary and the May Trading Track Record

falsely represent that Safevest Pool participants have and will achieve almost certain profits through commodity futures trading.

13.     Safevest solicited participants primarily through a multi-level marketing scheme whereby prospective participants were solicited by other individuals or entities, some of whom were existing Safevest participants.  Safevest referred to these solicitors as "Consultants."  These Consultants at all times acted as agents or other persons acting for Safevest within the scope of their employment or office.

14.     Safevest distributed or caused to be distributed to Safevest Consultants forms to be executed as contracts between the respective Consultant and the Safevest participant who was successfully solicited by the Consultant.  The forms that Safevest provided to Consultants included one or more standardized contract forms that provided, in relevant part, for Safevest to pay commissions or fees to the referring Consultant from a stated percentage of the "net proceeds" from the participant's account with Safevest.  Consultants who successfully solicited new participants to the Safevest Pool typically received a 10% "referral fee" from the purported profits made by new participants they solicited.

15.     Safevest also disseminated or caused to be disseminated to Safevest's Consultants false written promotional materials that were then distributed to pool participants, including, but not limited to, the May Trading Track Record, the "Overall Summary" and the Executive Summary.

### Receipt of Participant Funds

16.     Safevest distributed or caused to be distributed to pool participants and prospective pool participants Safevest Client Participation Forms that directed pool participants to send funds to bank accounts under Safevest's control.  Safevest included this directive as part of the "Safevest Client Participation Forms"

designated as "Form G: Client Transmittal" and "Form H: Transmittal Deposit/Withdrawal Information."

17.     Between May 2007 and December 2007, Safevest distributed, or caused to be distributed, to pool participants and prospective pool participants, directions to send funds to an account in Safevest's name at Wells Fargo Bank for the purpose of participating in the Safevest Fund.

18.     Between May 2007 and November 2007, Safevest also had a bank account at UBS Financial Services, Inc. ("UBS") that served as a means for Safevest pool participants to deposit funds with Safevest for the purpose of participating in the Safevest Fund.

19.     Between approximately January 2008 and May 2008, Safevest distributed or caused to be distributed to pool participants an account opening form that directed pool participants to send funds to an account in Safevest's name at Wachovia Bank for the purpose of participating in the Safevest Pool.

### Fraudulent Conduct by Safevest

20.     Safevest defrauded prospective and actual pool participants by (a) distributing or causing to be distributed to pool participants Client Participation Forms that falsely represented the existence of commodity futures trading by the Safevest Pool; (b) distributing or causing to be distributed to pool participants Client Participation Forms that misrepresented the profits and risk of loss inherent in commodity futures trading and the Safevest Pool; (c) issuing or causing to be issued false trading records; (d) distributing or causing to be distributed to pool participants false account statements; and (e) misappropriating pool participant funds.

21.     Safevest used mail and wire instrumentalities of interstate commerce to defraud pool participants and to engage in practices that operated as a fraud on clients.  Safevest accepted bank wire transfers from pool participants and made

bank wire transfers to pool participants to misappropriate funds, and used U.S. mail and interstate telephone services to send false trading statements to pool participants, to send fraudulent account opening documents to pool participants, and to make numerous misrepresentations to pool participants.

**Safevest Misrepresented the Existence
of the Safevest Pool Trading Account**

22.     Safevest did not establish any commodity pool trading account for the Safevest Pool.  Contrary to the fact that no commodity pool trading account was established, Safevest made numerous misrepresentations to pool participants by falsely stating that a Safevest Pool trading account existed.

23.     As part of the Safevest Client Participation Forms, Safevest distributed or caused to be distributed to pool participants the "Overall Summary, Form E."  The "Overall Summary" falsely states that Safevest's trades "are electronically cleared trades at the Chicago Mercantile Exchange for E-mini S&P and, potentially, at the Chicago Board of Trade for electronic 30-year bond and 10 year note futures."  The "Overall Summary" contains additional misrepresentations that the Safevest Pool has a record of successful commodity futures trading.  Such misrepresentations include, but are not limited to, the following:

    a.  "virtually 90%-95% of all transactions are performed by computerization ... Strict rules are in place that assume "no gambling" with transaction amounts...";

    b.  trading that is performed has a "loss" tolerance of two and one –half percent of principal per trading day";

    c.  "Safevest minimal transaction is $500k.  If a lower amount is taken, that amount will be combined with funds from another source (IF AVAILABLE) in order to minimize risk and accentuate profitability";

d.  "[A]mounts in $1 [million dollar] increments are excellent in that it allows a greater number of transactions to occur to minimize any risk and/or to accentuate profitability... please note that any transactions involving amounts of $10 [million dollars] or more will, most likely *(based on experience)* average over 10,000 contract trades per year"; and

e.  "[S]imulated trading, as well as real-time testing of past actual trades, confirmed the benefit of" described futures trading strategies.

24.    Safevest also made oral misrepresentations through its agents and employees to pool participants about the existence of a Safevest Pool trading account.  Safevest falsely represented to some pool participants that Safevest had opened commodity futures accounts at one or more brokerage firms.

25.    Safevest represented to prospective pool participants that participant funds were pooled into an account at Wells Fargo Bank in the name of Safevest. Safevest distributed or caused to be distributed to pool participants the Overall Summary, which falsely represented that funds in the Safevest Wells Fargo Bank account were transferred to a Safevest commodity futures trading account.  The Overall Summary further falsely represented to pool participants that 90-95% of Safevest commodity futures trades are conducted using computerized trading software.  In fact, Safevest had no commodity futures trading account at UBS or elsewhere.

### Safevest Misrepresented
### Profits and Minimized Risk of Loss

26.    Safevest falsely represented to pool participants that profits were virtually guaranteed and that risk of loss was minimal in connection with the Safevest Pool trading account.  Not only were these representations fraudulent because no Safevest Pool trading account existed, they were also fraudulent

because profits cannot be guaranteed and risk of loss cannot be minimized in commodity futures trading.

27.     Safevest fraudulently guaranteed profits by distributing or causing to be distributed to pool participants the "Participation Agreement," Form F, as part of the Safevest Client Participation Forms.  The "Participation Agreement" falsely states that Safevest offers a "$50 Million Blocked Account Trading Program" at UBS that "guaranteed 200% annual yield to participant," a "100K+ Blocked Account Trading Platform" that "guaranteed 51% annual yield to participant," and a "Daily Commodities Trading Platform" that was described as "historically most aggressive of all platforms."

28.     Safevest disseminated, or caused to be disseminated, to pool participants, the Executive Summary that falsely represents that Safevest engages in three trading programs that guarantee profits for pool participants.  The Executive Summary states that the first program is called the "$50 Million Blocked Account Trading Program" and "offers a guaranteed 200% return per year."  The second program is designated the "$100K Blocked Trading Account Program." The Executive Summary states that this program offers "a guaranteed 51% return per year."  The third program is called the "Commodities Daily Trading Program." The Executive Summary represents that this program requires a minimum of $5,000 for participation and promises a daily yield on the investment of between .8% and 1%.

29.     In addition to profit misrepresentations, Safevest fraudulently represented to Safevest Pool participants that there was minimal risk of loss associated with trading commodity futures contracts.  Notwithstanding the fact that the Safevest Pool conducted no futures trading, Safevest, through its employees and agents, orally represented to pool participants that such trading was low risk because only 8-13% of pool participant funds were used for trading and that

trading would stop if losses on any particular day reached 2.5% of funds being traded.

30.     Safevest further misrepresented risk of loss in writing by providing or causing to be provided to pool participants the Overall Summary.  The Overall Summary represents that the Safevest Pool utilizes a computerized trading program that has a loss tolerance of 2.5% of principal per trading day and that no more than 8% to 13% of principal is exposed at any given time.

**Safevest Provided a False
Trading Record to Pool Participants**

31.     Safevest distributed or caused to be distributed to pool participants a document captioned "May Trading Track Record."  This document falsely represents that "these are the actual percentages for the month of May 2007 of best efforts, past financial performance is not an indication of future results (sic)."  The daily percentages listed in this document include positive "gross" percentage figures for each and every "trading day" in May 2007, varying from 8/10ths of 1 percent (.008) to 2.8% (.028) returns, and that the average gross daily return for the Safevest Pool during the month of May 2007 was 1.62%.  The document further falsely claimed that "client has grossed for the month $191,100 (est.) in dividends."

32.     Safevest provided or caused to be provided to pool participants false trading statements, and represented that the statements were summaries of the trading activity in the accounts of individual Safevest pool participants.  The statements show deposits in the accounts and daily trading profits of between 1.25% and 3.27% during the period June 4, 2007 to July 7, 2007.

33.     In fact, the representations regarding profitable trading in May, June and July 2007 were false and materially misleading because Safevest had no track record of any commodity futures trading in May 2007 or in any month thereafter.

**Safevest Provided False**
**Account Statements to Pool Participants**

34.     Safevest provided or caused to be provided to pool participants account statements that purported to show the current value of an individual participant's account with the Safevest Pool.

35.     The periodic account statements that Safevest provided or caused to be provided to pool participants routinely included a daily positive value percentage figure that purported to represent the actual "daily return," "market gain," "client ($)" and "[b]alance" for each trading day.  The "daily return" percentage figures set forth in these account statements were always positive percentage numbers, typically with a value between 1% and 2% daily.

36.     The periodic statements that Safevest provided or caused to be provided to pool participants were false and materially misleading because Safevest did not trade participants' funds in a commodity futures pool as promised and all claims of profitable futures trading, or futures trading of any sort, were fictitious.

**Safevest Misappropriated**
**Pool Participant Funds**

37.     Contrary to its representations that the funds of Safevest pool participants were being used to trade commodity futures contracts, Safevest misappropriated virtually all of those funds.  Safevest did not deposit any pool participant funds in a commodity pool futures trading account pursuant to the requirements of the Commodity Exchange Act (the "Act").  Safevest also did not establish a commodity futures trading account for the benefit of participants in the Safevest Pool with a futures commission merchant registered with the CFTC.

38.     Safevest misappropriated the funds of Safevest Pool participants by: making payments to pool participants from the funds of other pool participants in

the manner of a Ponzi scheme; using pool funds to pay personal and other expenses unrelated to commodity futures trading; and by paying sales agents.

39.    Safevest falsely represented to pool participants that their funds would be pooled and used to trade commodity futures contracts.  Safevest further represented that monthly returns paid to pool participants were the result of profits derived from commodity futures trading.  Contrary to these representations, the funds that were sent by Safevest to pool participants were not derived from commodity futures trading profits, but instead were merely other pool participants' funds.  In fact, Safevest made payments of at least $7,750,000 to existing pool participants from funds collected from pool participants.

40.    Contrary to the claim that the pool participants' funds were devoted to the trading of commodity futures contracts, Safevest used the pool participants' funds to pay personal expenses and to transfer amounts to persons and entities unrelated to commodity futures trading.

41.    Safevest represented that Safevest's Consultants received commissions from trading profits.  Contrary to these representations, Consultant commissions were, in fact, paid directly out of funds supplied by pool participants.  Commissions were not, as claimed, funded from the profits of commodity futures trading, because Safevest did not conduct any commodity futures trading.

**Safevest Failed to Disclose Material Information**

42.    Safevest failed to disclose, or failed to cause to be disclosed, material information to pool participants and to prospective pool participants including but not limited to the following: (a) that Safevest had no commodity futures trading account; (b) that Safevest was an unregistered commodity pool operator ("CPO"); (c) that Safevest had no profitable commodity futures trading track record and that the track records provided to pool participants were fictitious; and (d) that Safevest misappropriated participants' funds.

**Safevest Illegally Operated a Commodity Pool**

43.    During the relevant time, Safevest was not registered with the CFTC as a CPO as required under the Act.  During this time, Safevest operated the Safevest Pool as an "investment trust, syndicate or similar form of enterprise" (*see* 7 U.S.C. § 1a(5) (2006)) and, in connection therewith, solicited, accepted, and received funds from others for the purpose of trading commodity futures contracts on designated contract markets.  During the relevant time, Safevest permitted Ervin to be associated with Safevest in the capacity of a person engaged in the solicitation of funds for participation in the commodity pool, or the supervision of any person or persons so engaged.

44.    Safevest used mail and wire instrumentalities of interstate commerce in connection with its business as a CPO.  Safevest accepted bank wire transfers from pool participants and made bank wire transfers to pool participants to misappropriate funds, used mail and telephone wires to send false trading statements to pool participants, used mail and telephone wires to send fraudulent account opening documents to pool participants, and used telephone wires to make numerous misrepresentations to pool participants.

45.    Safevest represented that participant funds would be pooled and transferred to a commodity pool trading account for the benefit of Safevest Pool participants.  Safevest further represented that pool participant funds would be used to trade commodity futures contracts on the Chicago Mercantile Exchange and the Chicago Board of Trade.

## III.

## CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue**

1.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the CFTC to seek injunctive

relief against any person or entity whenever it shall appear to the CFTC that such person or entity has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any CFTC rule, regulation or order.

2.      Venue properly lies with the Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), in that defendants are found in, inhabit, or transact business in this district, and the acts and practices in violation of the Act occurred, are occurring, or are about to occur within this district.

**B.      Fraud by a CPO**

3.      As defined in Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), a CPO is:

> any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

4.      Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), prohibits CPOs from using the mails or any other means of interstate commerce to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

5.      Since at least May 2007, Safevest, while acting as an unregistered CPO, solicited, accepted or received funds from others and engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in futures.

6. Safevest, through its agents, engaged in a transaction, practice or course of business which operated as a fraud or deceit upon Safevest Pool participants and prospective Safevest Pool participants by (1) making or causing to be made fraudulent representations that Safevest operated a successful commodity pool that profitably traded exchange-traded commodity futures, when in fact no such commodity pool existed and no such trading occurred; (2) misrepresenting the profits and risk of loss inherent in commodity futures trading; (3) issuing false trading records to pool participants; (4) providing false account statements to pool participants; and (5) misappropriating participant funds, all in violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006).

7. Each misrepresentation and omission of material fact, issuance of a false report, and misappropriation of customer funds is a separate and distinct violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1) (B) (2006).

**C.      Fraud by an Associated Person of a CPO**

8. As defined by Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), an associated person ("AP") of a CPO is one who is:

> associated with a commodity pool operator as a partner, officer, employee, consultant, or agent . . . in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered.

9.   In its judgment against Ervin on December 1, 2008, the Court found that Ervin violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), by acting as an AP of a CPO without being registered with the CFTC.

10.   Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) (2006), prohibits CPOs from using the mails or any other means of interstate commerce "to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant."

11.   In its judgment against Ervin on December 1, 2008, the Court found that Ervin, while acting as an unregistered AP of a CPO, solicited, accepted or received funds from others and engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in futures.

12.   In its judgment against Ervin on December 1, 2008, the Court found that Ervin employed a device, scheme or artifice to defraud participants and prospective participants of Safevest in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) (2006).

13.   The acts, misrepresentations, omissions, and failures of Ervin occurred within the scope of his employment or office with Safevest.  Therefore, Safevest is liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B)(2006), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2009).

14.   Each misrepresentation and omission of material fact, issuance of a false report, and misappropriation of customer funds is a separate and distinct violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1) (A) (2006).

**D.   Failure to Register as a CPO**

15.   Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or

any means or instrumentality of interstate commerce in connection with his business as a CPO.

16.    Safevest used the mails, wires, or other  instrumentalities of interstate commerce in or in connection with its business as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

17.    Safevest does not qualify for a registration exemption under either the Act or the CFTC Regulations.

**E.       Failure to Register as an AP of a CPO**

18.    Section 4k(2) of the Act, 7 U.S.C. § 6k(2)(2006), states that it is:

> unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant or agent . . . in any capacity that involves (i) the solicitation of funds, securities or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission . . . as an associated person of such [CPO] . . . .  It shall be unlawful for a [CPO] to permit such a person to become or remain associated with the [CPO] in any such capacity if the [CPO] knew or should have known that such person was not so registered . . .

19.    In its judgment against Ervin entered on December 1, 2008, the Court determined that Ervin associated with a CPO, Safevest, and had been involved in the solicitation of funds for participation in pools or the supervision of any person so engaged, while failing to register as an AP of the CPO, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

20.    Safevest permitted Ervin to become and remain associated with Safevest and knew, or should have known, that Ervin was not registered as an AP of Safevest, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

# IV.

## ORDER OF PERMANENT INJUNCTION

**A.    Prohibition on Conduct in Violation of the Act**

Safevest, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Safevest, are permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of Sections 4o(1)(A), 4o(1)(B), 4m(1) and 4k(2) of the Act, 7 U.S.C. §§ 6o(1)(A), 6o(1)(B), 6m(1), and 6k(2) (2006).

**B.    Prohibition on Activities Related to Trading in any Commodity**

Safevest is permanently restrained, enjoined, and prohibited from engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) (2006) ("commodity interest"), including, but not limited to, the following:

    a.   Trading on or subject to the rules of any registered entity, at that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

    b.   Engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, directly or indirectly, whether by power of attorney or otherwise;

    c.   Soliciting, receiving or accepting any funds from any person in connection with the purchase or sale of any commodity interest contract;

    d.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9) (2009), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9) (2009);

    e.   Entering into any commodity interest transactions for their own personal account, for any account in which they has a direct or indirect interest and/or having any commodity interests traded on their behalf; and

    f.   Engaging in any business activities related to commodity interest trading.

## C.   Scope of Injunction

The injunctive provisions of this Order shall bind Safevest, any person who acts in the capacity of officer, agent, servant or employee of Safevest (other than the Receiver and any of the Receiver's agents), and any person who receives actual notice of this order, by personal service, email or facsimile, insofar as he or she acts in active concert or participation with Safevest.

## V.

## RESTITUTION, DISGORGEMENT, CIVIL MONETARY PENALTY, AND ANCILLARY RELIEF

**IT IS HEREBY ORDERED** that Safevest shall comply fully with the following terms, conditions and obligations relating to restitution, disgorgement, civil monetary penalty, and ancillary relief.

## A.   Restitution

1.   Safevest shall make restitution in the amount of $17,845,679, plus pre-judgment interest of $586,252 (for a total of $18,431,931) and post-judgment interest (the "Restitution Obligation").  The Restitution Obligation shall commence immediately upon entry of this Order.  The Restitution Obligation represents the amount of funds that Safevest customers deposited into bank accounts in the name of Safevest as a result of the course of illegal conduct alleged in the Complaint less the amount of identified funds paid to such customers from those bank accounts.

2.   The Restitution Obligation shall not limit the ability of any customer from proving that a greater amount is owed, and nothing herein shall be construed

in any way to limit or abridge the rights of any customers of Safevest that exist under state or common law.

3.    Pre-judgment interest was determined by using the underpayment rate established quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2) from the date of the filing of the Complaint to the date of the Court's default judgments against against Erwin and Slye, December 1, 2008.

4.    Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

5.    To effect payment of the Restitution Obligation by Safevest and to effectuate the distribution of restitution, the Court appoints the National Futures Association ("NFA") as Monitor.  The Monitor shall collect restitution payments from Safevest and make distributions as set forth below.  Because the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

6.    Safevest shall make its required restitution payments under this Order in the name of "Safevest Settlement Fund" and shall send such restitution payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover of a letter that identifies Safevest as the payer, the name and Docket number of this action and the name of this Court.  Safevest shall simultaneously transmit copies of the cover letter and form of payment to:  (a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; and

(b) the Chief, Office of Cooperative Enforcement, Division of Enforcement, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

7.      The Monitor shall distribute restitution funds to Safevest's customers in an equitable manner as determined by the Monitor.   The Monitor shall oversee the distribution of funds of the Restitution Obligation and shall have the discretion to defer distribution until such time as it may deem appropriate.  In the event that the amount of restitution payments made by Safevest to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of the making a restitution distribution to customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for the CMP Obligation as set forth in Section III.C, below.

8.      To the extent that any funds accrue to the U.S. Treasury as a result of the Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in the preceding paragraph.

9.      The Restitution Obligation shall be reduced by the amount of any payment made by Safevest to satisfy the Disgorgement Obligation herein.

10.      The Restitution Obligation shall be reduced by the amount of any payments made by Ervin or Slye to satisfy orders of restitution and/or disgorgement entered against them in this proceeding.

**B.      Disgorgement**

1.      Safevest shall make disgorgement in the amount of $17,845,679, plus pre-judgment interest of $586,252 (for a total of $18,431,931) and post-judgment interest ("Disgorgement Obligation").  The Disgorgement Obligation shall commence immediately upon entry of this Order.  The Disgorgement Obligation represents the amount of benefits that Safevest received as measured by the

amount customers deposited into bank accounts in the name of Safevest as a result of the course of illegal conduct alleged in the Complaint less the amount of identified funds paid to such customers from those bank accounts.

2. The Disgorgement Obligation shall not limit the ability of any customer from proving that a greater amount is owed, and nothing herein shall be construed in any way to limit or abridge the rights of any customers of Safevest that exist under state or common law.

3. Pre-judgment interest was determined by using the underpayment rate established quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2) from the date of the filing of the Complaint to the date of the Court's default judgments herein against Ervin and Slye, December 1, 2008.

4. Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

5. The Court appoints the Monitor to effect payment of the Disgorgement Obligation by Safevest and to effectuate the distribution of disgorged funds. The Monitor shall collect disgorgement payments from Safevest and make distributions as set forth below. Because the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

6. Safevest shall make its required disgorgement payments under this Order in the name of "Safevest Settlement Fund" and shall send such disgorgement payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover of a letter that identifies Safevest as the payer, the name

and Docket number of this action and the name of this Court.  Safevest shall simultaneously transmit copies of the cover letter and form of payment to:  (a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; and (b) the Chief, Office of Cooperative Enforcement, Division of Enforcement, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

7.     The Monitor shall distribute disgorgement funds to Safevest customers in an equitable manner as determined by the Monitor.  The Monitor shall oversee the distribution of funds of the Disgorgement Obligation and shall have the discretion to defer distribution until such time as it may deem appropriate. In the event that the amount of disgorgement payments made by Safevest to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of the making a distribution to customers is impractical, the Monitor may, in its discretion, treat such disgorgement payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for the CMP Obligation as set forth in Section III.C, below.

8.     To the extent that any funds accrue to the U.S. Treasury as a result of the Disgorgement Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in the preceding paragraph.

9.     The Disgorgement Obligation shall be reduced by the amount of any payment made by Safevest to satisfy the Restitution Obligation herein.

10.     The Disgorgement Obligation shall be reduced by the amount of any payments made by Ervin or Slye to satisfy orders of restitution and/or disgorgement entered against them in this proceeding.

**C.    Civil Monetary Penalty**

1.    Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(2006), judgment is entered against Safevest as of the date of this Order for a civil monetary penalty in the amount of $5,000,000, plus post-judgment interest ("CMP Obligation").

2.    Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

3.    Safevest shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made by other than electronic funds transfer, Safevest shall make the payment payable to the U.S. Commodity Futures Trading Commission and send it to the following address:

> Commodity Futures Trading Commission
> Division of Enforcement
> Attention:  Marie Bateman – AMZ-300
> DOT/FAA/MMAC
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169
> Telephone: 405-954-6569

If the payment is to be made by electronic funds transfer, Safevest shall contact Marie Bateman or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Safevest shall accompany the payment of the CMP Obligation with a cover letter that identifies the payer and the name and docket number of this proceeding.  Safevest shall simultaneously transmit copies of the cover letter and the form of payment to the (a) Director, Division of Enforcement, Commodity Futures Trading Commission, at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and (b) Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

**D.     Ancillary Equitable Relief**

**1.     Application of Payments**

All payments by Safevest pursuant to this Order shall first be applied to satisfaction of the Restitution Obligation and the Disgorgement Obligation.  After satisfaction of the Restitution Obligation and Disgorgement Obligation, payments by Safevest pursuant to this Order shall be applied to satisfy the CMP Obligation.

**2.     Partial Payments**

Any acceptance by the CFTC and/or Monitor of partial payment of Safevest's Restitution Obligation and/or CMP Obligation shall not be deemed a waiver of the respective requirement to make further payments pursuant to this Order, or a waiver of the CFTC 's and/or Monitor's right to seek to compel payment of any remaining balance.

**3.     Prohibition on Transfer of Assets**

Safevest shall not transfer, or cause others to transfer, funds or other property to their custody, possession, or control of any person or entity for the purpose of concealing such funds from this Court, the CFTC, or the Monitor until the Restitution Obligation, Disgorgement Obligation, and CPM Obligation have been satisfied under this Order.

**4.     Cooperation**

Safevest shall cooperate fully with the CFTC and any government agency seeking to enforce the provisions of this Order in carrying out all duties with respect to the Restitution Obligation, Disgorgement Obligation, and CMP Obligation.  Safevest shall cooperate fully with the CFTC and any government agency seeking to enforce the provisions of this Order in explaining its financial income and earnings, status of assets, financial statements, asset transfers and tax returns, and shall provide any information as may be required by the CFTC and any government agency seeking to enforce the provisions of this Order.

**5.      Notice**

All notices required by this Order shall be sent by certified mail, return receipt requested.  Safevest shall provide the CFTC and the Monitor with written notice of all changes to its contact telephone number and/or mailing address.

**E.      Jurisdiction**

This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.  This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Central District of California, and all provisions of the Act and CFTC Regulations relating or referring to the obligations hereunder.


**Done and Ordered this 13th day of July 2009, at Santa Ana, California.**


_____                    _____
                                                 **JAMES V. SELNA**
                                                 **UNITED STATES DISTRICT JUDGE**